JESSICA L. LINEHAN (SBN 223569)
linehan.jessica@dorsey.com
DORSEY & WHITNEY LLP
600 Anton Boulevard, Suite 2000
Costa Mesa, CA 92626-7655
Telephone: (714) 800-1400
Facsimile: (714) 800-1499

JOSEPH W. HAMMELL (*Admitted Pro Hac Vice*)
hammell.joseph@dorsey.com
RYAN E. MICK (*Admitted Pro Hac Vice*)
mick.ryan@dorsey.com
JOEL O'MALLEY (SBN 262958)
omalley.joel@dorsey.com
DORSEY & WHITNEY LLP
50 S. Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile: (612) 340-2868

Attorneys for Defendant
CANON SOLUTIONS AMERICA, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN JONES and JAVIER CRESPO, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CANON BUSINESS SOLUTIONS, INC., a Corporation, and DOES 1-100, inclusive,<br><br>Defendants. | CASE NO. 2:12-CV-07195-JAK-JEM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER APPROVING AWARD OF ENHANCEMENT PAYMENTS**<br><br>Date: September 8, 2014<br>Time: 8:30 a.m.<br>Courtroom: 750 – 7th Floor<br>Judge: Honorable John A. Kronstadt |

# TABLE OF CONTENTS

I. Introduction ...................................................................................................1

II. The Court Should Deny the Requested Enhancement Payments and Instead Award the Agreed-Upon Enhancement Payments..........................................2

    A. This Court must vigilantly and carefully scrutinize each requested enhancement payment. ......................................................................2

    B. The requested enhancement payments would be an excessive portion of the settlement fund. ........................................................................4

    C. Plaintiffs have not justified their request to take excessive enhancement payments from their fellow class members. ...................5

        1. Plaintiffs' declarations are not credible. .....................................5

        2. Plaintiffs performed no exceptional services to warrant their exceptional requests................................................................7

        3. Harris and Lomax have not suffered retaliation. ......................10

III. Conclusion...................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**
**Cases**

*Alberto v. GMRI, Inc.*,
   252 F.R.D. 652 (E.D. Cal. 2008) ................................................................................... 3, 4, 5

*Clayton v. Knight Transportation*,
   2013 WL 5877213 (E.D. Cal. 2013) ..................................................................................... 8

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ................................................................................................. 4

*Cook v. Niedert*,
   142 F.3d 1004 (7th Cir. 1998) ............................................................................................ 3, 4

*Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bureau*,
   2009 WL 356871 (N.D. Cal. Oct. 27, 2009) ........................................................................ 4

*Kakani v. Oracle Corp.*,
   2007 WL 1793774 (N.D. Cal. 2007) .................................................................................... 3

*Lugliani v. Kinder Morgan G P Inc.*,
   Case no. 8:10-cv-01303 (C.D. Cal. Mar. 8, 2012) ............................................................... 9

*In re Mego Fin. Corp. Sec. Litig.*,
   213F.3d 454 (9th Cir. 2000) ................................................................................................. 4

*Monterrubio v. Best Buy Stores, L.P.*,
   291 F.R.D. 443 (E.D. Cal. 2013) ............................................................................... 3, 4, 5, 8

*Phillip Fowler v. Canon Solutions America, Inc. f/k/a a Canon Business Solutions, Inc.*,
   Case No. 9:13 cv 80940 ........................................................................................................ 1

*Partridge v. Shea Mortgage, Inc.*,
   2008 WL 5384542 (N.D. Cal. 2008) ................................................................................. 3, 8

*Radcliffe v. Experian Info. Solutions Inc.*,
   715 F.3d 1157 (9th Cir. 2013) ............................................................................................ 2, 3

*Rodriguez v. D.M. Camp & Sons*,
   2013 WL 2146927 (E.D. Cal. 2013) .................................................................................. 8, 9

*In re SmithKline Beckman Corp. Sec. Litig.*,
   751 F. Supp. 525 .................................................................................................................... 4

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ................................................................................................. 3

*In re U.S. Bancorp Litig.*,
   291 F.3d 1035 (8th Cir. 2002) ............................................................................................... 4

*Wright v. Linkus Enters., Inc.*,
   259 F.R.D. 468 (E.D. Cal. 2009) ........................................................................................... 4

## I. Introduction

In order to reach a settlement of this case, Defendant Canon Solutions America, Inc. ("CSA"), the successor to Canon Business Solutions, Inc., agreed not to oppose certain "Enhancement Payments" to be taken from the settlement amount that would otherwise be paid to class members and instead diverted to the named and certain opt-in Plaintiffs. *See* Dkt 172, Exh. 1, ¶ VI.B; Dkt. 174 § III.E. The amounts CSA agreed not to oppose, after prolonged negotiations with Plaintiffs, were up to $8,500 for each of the two named plaintiffs, Steven Jones and Javier Crespo; up to $2,000 for each of the opt-in plaintiffs who were deposed (Arturo Castaneda, Jr., Fredrick Lomax, Steven Molina, Richard Parker, William Harris, and Joey Wood); and up to $500 for the two individuals (Phillip Fowler and Jesse Belgarde) who initiated a copycat action filed in Florida federal court,[1] dropped that case, then belatedly opted in to this case. Taken together, CSA agreed not to oppose a total amount of up to $30,000 to be added to the substantial awards these named and opt-in plaintiffs already would receive from the settlement. That $30,000 amounted to nearly .68% of the gross settlement amount of $4,425,000 – a percentage consistent with enhancement payments permitted by courts approving other wage-and-hour settlements, including this Court.[2]

Plaintiffs now request enhancement payments totaling $71,000, more than double the amounts CSA agreed not to oppose. Their new requests are 1.60% of the gross settlement amount, a percentage far exceeding what courts typically award.[3] Plaintiffs

---

[1] *See* Dkt. No. 165 (Joint Status Report informing the Court that an action was filed in the United States District Court for the Southern District of Florida, entitled *Phillip Fowler v. Canon Solutions America, Inc. f/k/a Canon Business Solutions, Inc.*, Case No. 9:13 cv 80940, alleging a claim under the FLSA substantially identical to the FLSA claim alleged in this case). Belgarde joined the Florida action before Fowler voluntarily dismissed it on November 8, 2013.

[2] Defendant does not oppose that portion of Plaintiffs' motion which seeks approval of the payment of attorneys' fees and reimbursement of costs in the amounts sought.

[3] In fact, Plaintiffs' new requests for $71,000 constitutes almost 2.5% of the net

do not even purport to show that the named and opt-in plaintiffs did anything different than what normally would be expected of a plaintiff in a putative class action to justify the excessive payments they seek. The justifications they do offer are found in declarations that are rife with inaccuracies and contradict prior sworn testimony. This Court should deny Plaintiffs' unreasonable requests to take even more money from the classes, and instead approve the enhancement payments already agreed upon by the parties.

### II. The Court Should Deny the Requested Enhancement Payments and Instead Award the Agreed-Upon Enhancement Payments

#### A. This Court must vigilantly and carefully scrutinize each requested enhancement payment.

The Ninth Circuit recently reminded district courts that enhancement payments in class action settlements "may be proper" but "should not become routine practice." *Radcliffe v. Experian Info. Solutions Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013). A California federal district court aptly summarized these payments:

> So-called "incentive payments" are a recent invention by those who handle class actions. Class actions did much justice without them for many decades. While there is a theoretical rationale for incentive payments, there is also a major downside. The downside is that the payments lend themselves for use as side payments to induce named plaintiffs to go along with sweetheart deals. ***Ordinarily, named plaintiffs ought to receive no more or less than the absent class members they***

---

settlement amount (the amount actually available for disbursement to class members). The net settlement amount is calculated by subtraction from the $4,425,000 gross settlement amount $1,327,500 in requested attorneys' fees, $200,000 in requested costs, $55,000 in claims administrator costs, and $7,500 in payments to the California Labor and Workforce Development Agency for the PAGA claims.

>           ***purport to represent.***  In this way, they are incentivized, out of
>           self interest, to achieve the best possible result for the class.

*Kakani v. Oracle Corp.*, 2007 WL 1793774 (N.D. Cal. 2007) (emphasis supplied).

In considering how much to award in enhancement payments, this Court must be "vigilant" and "scrutinize carefully" the requests that have been made. *Radcliffe*, 715 F.3d at 1164; *Partridge v. Shea Mortgage, Inc.*, 2008 WL 5384542, at *1 (N.D. Cal. 2008) (enhancement payments should be approached "cautiously"). Plaintiffs must "present evidence" that the named and opt-in plaintiffs took "substantial efforts" to serve and represent the classes. *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). In setting the payment amounts, this Court must balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003). This Court must evaluate each of Plaintiffs' requested enhancement payments "individually" to determine "the degree to which the class[es] ha[ve] benefitted from [each individual's] actions." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 462 (E.D. Cal. 2013); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).[4]

Finally, enhancement payments should not be awarded merely for plaintiffs' costs or for "identifiable services rendered to the class directly under the supervision of class counsel." *Staton*, 327 F.3d at 977. Those costs and services should be repaid from the litigation expenses and attorneys' fees awarded to class counsel. *Id.*

---

[4] Plaintiffs cite *Cook v. Niedert* for the proposition that an enhancement payment of $25,000 may be reasonable. The award in *Cook* is not relevant here. In that case and unlike here, the suit recovered more than $13 million and the single named plaintiff spent "hundreds of hours" with his attorneys, providing them with an "abundance of information." 142 F.3d at 1016. Even if *Cook* were somehow relevant, the settlement amount here is less than one-third the amount in *Cook*, suggesting that a $7,500 enhancement payment to Jones and Crespo (more than one-third of $25,000) is more than generous.

### B. The requested enhancement payments would be an excessive portion of the settlement fund.

CSA agreed not to oppose enhancement payments totaling $30,000. CSA deemed those amounts excessive, but agreed not to oppose them in the interests of consummating a settlement. Plaintiffs now request that the Court approve taking that $30,000, **plus another $41,000**, from other class members and paying such amounts to a group of 10 named and opt-in plaintiffs. The $30,000 in total payments that CSA agreed not to oppose amount to a generous .68% portion of the overall settlement amount of $4,425,000, a percentage consistent with – and significantly higher than – amounts regularly approved by courts. For example, courts have approved enhancement payments totaling .17%, .18%, .20%, .35%, .50%, .56%, and .62% of overall settlement amounts, but have rejected payments totaling 1.87% and .71%.[5] The $71,000 requested by Plaintiffs amounts to **1.60%** of the overall settlement amount. This is clearly out of line with what is customary and appropriate.

Notably, a finding that enhancement payments in the aggregate are too large will trump a finding that individual payments are themselves reasonable. When the aggregate constitutes too high a percentage of the overall settlement amount, courts have not hesitated to cut the otherwise reasonable individual awards, sometimes by dramatic amounts, to arrive at a more appropriate proportion of the settlement. For

---

[5] *See Cook*, 142 F.3d at 1016 (.17%); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 535 (.18%); *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 477 (E.D. Cal. 2009) (.20%); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (.35%); *Jacobs v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 2009 WL 356871, at *5 (N.D. Cal. Oct. 27, 2009) (.50%); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (.56%); *see also Monterrubio, L.P.*, 291 F.R.D. at 462-63 (rejecting enhancement payment totaling 1.87% of overall settlement amount but approving payment totaling .62%); *Alberto*, 252 F.R.D. at 669 (stating reticence to ultimately approve enhancement payments totaling .71% of overall settlement amount); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 571-72 (7th Cir. 1992) (rejecting award totaling only .02% of overall settlement amount).

example, in *Alberto v. GMRI, Inc.*, the court acknowledged that the plaintiff's requested enhancement payment of $5,000 may be reasonable. However, when the court compared that payment to the overall settlement amount, it determined that at .71%, the payment was excessive absent substantial evidence justifying the high percentage. 252 F.R.D. at 669. Similarly, in *Monterrubio v. Best Buy Stores, L.P.*, the court recognized that an enhancement payment of $7,500 to the named plaintiff may be reasonable. Because that award was an excessive 1.87% of the overall settlement amount, the court slashed the payment to $2,500, or .62% of the overall settlement amount. 291 F.R.D. at 462.

Thus, even if the Court were to conclude that the individual enhancement payments requested by Plaintiffs were reasonable (which, as explained *infra*, it should not), because those payments constitute an unreasonably excessive proportion of the overall settlement amount, Plaintiffs' requests should be rejected.

### C. Plaintiffs have not justified their request to take excessive enhancement payments from their fellow class members.

In addition to being unreasonably large in the aggregate, Plaintiffs' requested enhancement payments also are individually unwarranted. Plaintiffs have presented no evidence that they provided services greater or different than a plaintiff would be expected to perform, have not pointed to any unique "risks" they endured by joining the lawsuit, and, with respect to opt-ins Lomax and Harris, present no legitimate evidence that they have suffered or even been threatened with retaliation because of their participation in the case.

#### 1. Plaintiffs' declarations are not credible.

In an attempt to substantiate their gratuitous requests, the named and opt-in plaintiffs submit vague, cookie-cutter declarations purporting to describe their services to the classes and risks they bore by joining the lawsuit. Plaintiffs' declarations repeatedly contradict their sworn deposition testimony, casting serious doubt on all of

their arguments purporting to support their excessive enhancement payment requests. Just a sampling of the inaccuracies include:

- Harris claims he has "never been involved in any type of lawsuit or litigation before." Harris Decl. ¶ 2. In fact, he admitted in his deposition that he was part of a class action lawsuit against Konica Minolta regarding missed lunch breaks. *See* Harris Dep. at 7:24-8:23.[6]

- Wood claims he spent 2.5 hours communicating with his attorneys before deciding to join the lawsuit. Wood Decl. ¶ 5. In fact, he had one 15-minute conversation with counsel. Wood Dep. at 15:4-25, 17:4-7. Wood also claims he spent 5 hours preparing for his deposition. Wood Decl. ¶ 7. In fact, all he did was "g[e]t a good night's rest." Wood Dep. at 14:12-16. And Wood claims he spent 12.5 hours helping to respond to written discovery. Wood Decl. ¶ 6. In fact, he never even saw the written discovery requests, and only produced some car expense documents. Wood Dep. at 17:19-18:16, 317:13-318:4.

- Castaneda claims he spent 3 hours communicating with his attorneys before deciding to join the lawsuit, "including the preparation for these meetings." Casteneda Decl. ¶ 5. In fact, he spoke "maybe once or twice on the phone" with his attorneys and never met with them until about a half hour before his deposition. *See* Castaneda Dep. at 40:15-41:11.

- Lomax claims he learned about this case from his attorneys in April 2013 and decided to join as a result of several conversations with his attorneys. Lomax Decl. ¶ 8. In fact, he learned about the case from a conversation with Castaneda in May 2013 and decided to join during the course of that conversation. Lomax Dep. at 17:13-24, 22:18-23:2.

- Crespo claims he spent 7-8 hours meeting with his attorneys to prepare for his deposition. Crespo Decl. ¶ 10. In fact, he spent about 3 hours doing so. *See* Crespo Dep. at 16:24-18:14.

---

[6] Deposition transcript pages are attached to the accompanying Declaration of Joel O'Malley.

- Jones claims he spent 4 hours preparing for his continued deposition. Jones Decl. ¶ 15. In fact, he met with his attorney for an hour and reviewed some documents for about 20 minutes. *See* Jones Dep. at 289:4-22.

If the named and opt-in plaintiffs cannot even accurately state simple facts like the time they spent preparing for a deposition, there is no reason to trust the large sums of hours they claim to have devoted to the case, or their supposed fears of retaliation from CSA or future employers.

### 2. Plaintiffs performed no exceptional services to warrant their exceptional requests.

Even if Plaintiffs' declarations could be trusted (which they cannot), they show nothing more than the typical time spent and activities performed by class action plaintiffs – certainly not warranting the huge payoffs they request.

According to Plaintiffs' memorandum, the named and opt-in plaintiffs (except for Fowler and Belgarde) devoted "dozens of hours assisting in the preparation and prosecution of this case." That "assistance" included such routine litigation tasks as producing documents; responding to interrogatories; sitting for deposition; vague references to conferring with counsel; and, with respect to Jones, attending the mediation. *See* Plfs' Mem. at 7-9 (citing declarations). They also claim they faced a "substantial risk of stigma and retaliation." *Id*. at 10.

The time spent on these routine activities and alleged risks undertaken – if Plaintiffs are to be believed – hardly justify the enhancement payments that CSA agreed not to oppose. Indeed, when a plaintiff performs the types of routine duties performed by class representatives, no enhancement payment need be awarded at all:

> While [plaintiff] spent some personal time helping counsel on the case, performing such tasks as submitting a declaration, corresponding via email and teleconference with class counsel, and producing documents, it does not appear that her

7

>participation justified additional payment beyond that which she will receive as a class member.

*Partridge*, 2008 WL 5384542, at *1. But if enhancement payments are to be made, Plaintiffs' supposed "services" to the classes do not justify their abnormally high requests. Rather, to warrant enhancement payments that are beyond the norm, Plaintiffs must present "evidence that [they] spent more time assisting counsel than occurs in the average case." *See Monterrubio*, 291 F.R.D. at 463.

Plaintiffs do not event attempt to make this showing. Instead of presenting real evidence, they offer vague statements about "working with" their attorneys, "remaining informed," and "staying in touch," and then cite a few cases in which enhancement payments similar to those they now request were allowed by courts. The cases are inapposite, and, in fact, support the enhancement payments CSA agreed not to oppose. For example, Plaintiffs cite *Clayton v. Knight Transportation*, 2013 WL 5877213 (E.D. Cal. 2013), for the proposition that a $7,500 enhancement payment is appropriate. Yet, in *Clayton*, the court reduced the plaintiff's requested enhancement payment from $7,500 down to $3,500. Notwithstanding that the plaintiff was deposed, had engaged in significant discovery, and the case was litigated for over two years, the court reasoned that the plaintiff had not done anything out of the ordinary to help reach a settlement. *Id*. at *11. The court further held that even taking into account the possibility that the suit could negatively affect the plaintiff's future job prospects, a $7,500 payment was too high. *Id*. The same is true here. There is no evidence whatever that the named and opt-in plaintiffs have spent any more time assisting counsel than would occur in any other case. Nor does the theoretical possibility that bringing the suit could negatively affect their future job prospects justify such large enhancement payments.

Plaintiffs also misplace their reliance upon *Rodriguez v. D.M. Camp & Sons*, 2013 WL 2146927 (E.D. Cal. 2013). In that case the named plaintiffs each spent 117 hours on tasks that included consultation with counsel and class members, document

8

preparation and review, and mediation. *Id*. at *17. Despite the substantial time the named plaintiffs devoted to the case, the court found $10,000 enhancement payments to be excessive and reduced them to $7,500. *Id*. at *18.

Rejecting Plaintiffs' excessive enhancement payment requests is further warranted by the fact that their settlement awards are themselves substantial and will more than adequately compensate them, even were the Court not to award any enhancement payments at all. With the exception of Fowler and Belgarde, the named and opt-in plaintiffs' settlement awards range from approximately $2,200 to almost $5,200. *See* O'Malley Decl. ¶ 2. Approval of the enhancement payments that have been requested would result in huge windfall awards for the named an opt-in plaintiffs of up to $14,176. Stated differently, the 10 named and opt-in plaintiffs account for **less than .50% of the class members**, but they would receive almost $100,000 in total awards, or **over 2.25% of the total settlement amount**. *See id.* There simply is no justification for providing the named and opt-in plaintiffs with such a disproportionate share of the settlement fund.[7]

Finally, the purported justification for the enhancement payments requested by Fowler and Belgarde is even thinner than for the other opt-in plaintiffs. They request payments of $1,500 each – in Belgarde's case, almost **19 times his settlement award** – for essentially doing nothing. Fowler filed his case in Florida federal district court in September 2013, almost two months after the parties completed mediation in this case and reached a settlement in principle. Only then did Fowler and Belgarde opt-in to this

---

[7] Plaintiffs have requested that this Court take judicial notice of its settlement approval order in *Lugliani v. Kinder Morgan G P Inc.*, Case no. 8:10-cv-01303 (C.D. Cal. Mar. 8, 2012), as support for enhancement payments of $10,000. *See* Dkt. No. 178-18. Docket number 56 in the *Lugliani* case – the plaintiffs' motion for award of class representative's service payments – explains that individual settlement payments there reached $15,000, and in two cases, $16,000. Thus, the $10,000 enhancement payments were reasonably proportionate to the settlement awards, unlike the excessive payments that Plaintiffs request here.

case. At that late stage, they cannot possibly claim to have assisted the classes in reaching a settlement. Yet they each claim to have spent an identical 10.5 hours providing "services" for this case. They ask to be paid by their fellow class members at a rate of $143 per hour for their "services" ($1,500 / 10.5), nearly as much as Plaintiffs' counsel's paralegals charge. It is abundantly clear that Fowler and Belgarde simply want money for dismissing their copycat Florida case, not for doing anything to help the classes here. Other class members should not suffer for Fowler's and Belgarde's avarice.

### 3. Harris and Lomax have not suffered retaliation.

Harris and Lomax have tried to buttress their excessive requests by inventing allegations of retaliation suffered as a result of their participation in the case. Harris Decl. ¶ 7; Lomax Decl. ¶ 7. Those allegations are demonstrably false.

Harris first complains that CSA treated his absence from work to attend his deposition as a vacation day. Harris was properly required to take a personal day for missing a day of work. It is CSA policy not to pay a non-exempt employee for time s/he misses from work to attend to personal legal matters. Harris was treated no differently than any other CSA employee. *See* Declaration of Dorianne Montalvo ¶ 3.

Harris also claims he has been "scrutinized" and is experiencing "difficulties at work" because in April 2014 CSA "tried" to write him up for borrowing a part from another employee, even though Canon and/or management policies allegedly required him to do so. Harris is wrong. Earlier this year, Harris was the subject of two serious customer complaints, one of which involved Harris leaving the customer's site without fixing the machine and never returning. Both customers asked not to deal with Harris again. He was appropriately disciplined upon verification of these complaints, just as any other CSA employee would be. Moreover, these were only the most recent customer complaints lodged against Harris. He was also disciplined following complaints made in September 2013 and July 2013, and was disciplined for poor

customer service in June 2011. *See id.* ¶ 3. The fact that Harris keeps failing at meeting CSA's reasonable customer service expectations is not evidence of retaliation.

Like Harris, Lomax complains that he had to take a vacation day to attend his deposition. As with Harris and any other CSA employee missing work for a personal legal matter, that is standard CSA policy. *See id.* ¶ 4. Lomax also claims that CSA began to "scrutinize" his work "a lot more" after his deposition, and that two months after his deposition he inappropriately received a written warning for not meeting performance metrics without having first received a verbal warning. Lomax is wrong. He received a verbal warning (the first step in CSA's progressive corrective action process) in August 2013 regarding his failure during the prior six months (thus, well before his July 2013 deposition). *See id.* ¶ 5. Consistent with CSA policy, Lomax was asked to and did sign an acknowledgement of having received a verbal warning, which likely explains his current confusion regarding whether it was a written warning. *See id.* Also consistent with CSA policy, the discipline was issued to Lomax in August 2013 for performance during the first six months of the year. In fact, a coworker of Lomax's received the exact same discipline, on the same day, regarding the same performance metric, for the same time period. *See id.*

If Harris and Lomax truly believed they suffered retaliation for their involvement in this case, they could have withdrawn their participation in the class settlement and pursued their individual claims against CSA. It is telling that they have not. Instead, they have used their decision to opt into this case to irresponsibly insinuate retaliation as an excuse for taking money from other class members. The Court should deny their unreasonable requests.

### III.  Conclusion

Following extensive negotiations, CSA agreed not to oppose certain enhancement payments for the named and opt-in plaintiffs in order to consummate a settlement of this case. Now Plaintiffs want more. They attempt to justify their requests for excessively

large payments – on top of the substantial settlement awards they already will receive – by pointing, with highly dubious credibility, to time spent engaging in exactly the types of activities one would normally expect of class action representatives.  Those ordinary activities do not justify Plaintiffs' extraordinary requests for compensation.  CSA respectfully requests that Plaintiffs' requests to divert unreasonable and unearned enhancement payments from other class members into their pockets be denied, and that, at most, the agreed-upon amounts be awarded.

DATED:  August 11, 2014

By /s/ Jessica Linehan
_____
Jessica Linehan

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER APPROVING AWARD OF ENHANCEMENT PAYMENTS
CASE NO. 2:12-CV-07195-JAK-JEM

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record who are registered for the CM/ECF system via Notice of Electronic Filing in accordance with the Federal Rules of Civil Procedure and Local Rule 5-3.3.

/s/ Jessica Linehan_____